UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARTY DOBSON,

          Plaintiff,

v.                                                                         Case No. 14-C-622

KEWAUNEE FABRICATIONS, LLC,

          Defendant.

**DECISION AND ORDER**

Plaintiff Marty Dobson sued his former employer, Kewaunee Fabrications, LLC, alleging retaliation in violation of the False Claims Act after it terminated his employment. Kewaunee has filed a motion for summary judgment, arguing that Dobson was not engaged in protected activity, and that, even if he was, he would have been fired anyway. For the reasons given below, the motion will be denied.

**I. Background**

Kewaunee Fabrications is a wholly-owned subsidiary of Oshkosh Corporation, a large defense contractor. Some of Kewaunee's products were sold to Oshkosh Defense, LLC, another Oshkosh subsidiary, which in turn sells some or all of its products to the federal government for military purposes.

In March 2012, Kewaunee hired Dobson to be a second-shift supervisor in the paint and assembly department. In 2012 and 2013—Dobson's first year—Phil Gomoluch, the plant manager,

shared various concerns about Dobson with Dave Schmidt, the operations manager. HR manager Jackie Nystrom testified that Dobson was on her "radar screen" as a problem employee in 2013 because his 2012 review was not sterling and had noted a number of areas in which he needed improvement. (ECF No. 23-16 at 5.) Schmidt testified that several other employees had made unfavorable comments about Dobson's performance in 2013, including the fact that his reports listed items as ready to ship, when in fact they were not. (ECF No. 23-17 at 16.) The inaccuracy of Dobson's reports was the most common theme in the complaints, but Gomoluch had also complained about the production levels during Dobson's shift. (*Id.* at 14-17.) Dobson disputes the veracity of the reports and argues that his performance, to the very last, was satisfactory.

These performance issues came to a head in late July 2013, when Gomoluch, the plant manager, asked Dobson to come to his office.[1] During the meeting, Gomoluch informed Dobson about inaccuracies in his reports, which others were complaining about, and other performance-related issues. According to Gomoluch, Dobson became agitated and told him "you can fire me right now." (ECF No. 17, ¶ 37.) Dobson states that during the meeting he raised an issue about labor cards being inaccurate or incomplete. As part of its production process, Kewaunee used work orders and "labor cards," which were internal, hand-written forms listing work order numbers and the amount of employee time used on a project. (ECF No. 15-6 at 61; ECF No. 23-1.) According to Dobson, Gomoluch's solution to the problems Dobson identified "was to tell Dobson to go to the weld bay and grab any route card off the rack and use those order numbers for any employee's route card that has failed in the recording of his time on the route cards." (ECF No. 21 at ¶ 26.)

---

[1] According to Dobson's Department of Defense complaint, the date would have been July 24.

2

In Dobson's view, using "any" work order numbers or labor cards would result in inaccurate information being recorded on those cards.

The same day, July 24, Dobson filed a complaint with the Department of Defense. His complaint states that "I was instructed today by my PRODUCTION MANAGER to use work order numbers from military orders and use these work order numbers on non-military work orders (employees time cards). . . . Please have the Military Accountants look into this to see if this is legal. It might be ok, but it appears that it is wrong." (ECF No. 23-2 at 10.)[2]

On July 25, the day after the heated meeting with Gomoluch, Dobson complained to Jackie Nystrom, the company's HR manager, that Gomoluch was "messing with labor cards" by asking Dobson to essentially use labor cards at random from unrelated projects, which Dobson found to be misleading. (ECF No. 17 at ¶ 40; ECF No. 20 at p. 12.) He states that he informed Nystrom that similar conduct at a previous job had resulted in fines and penalties being levied against his previous employer. Dobson states that he informed Nystrom that he would be filing a complaint with the Department of Defense. Nystrom denies that he said that and claims no one at the company learned of his complaint until several months later. Nystrom investigated the claim and discussed it with Gomoluch and another employee, and concluded no wrongdoing had occurred. On August 12, she left Dobson a voicemail to that effect, and Dobson responded in an email that he was optimistic the problem had been solved and was looking forward to proceeding under the direction of a new plant manager, Bryan Wetak. (ECF No. 15-6, Ex. 32.)

Some time soon after Dobson complained, Gomoluch was reassigned from plant manager

---

[2]He submitted the complaint by email dated July 24, although his postal return receipt is dated July 26.

3

to a senior engineering position, a move Kewaunee describes as lateral and unrelated, but which Dobson portrays as a demotion directly flowing from the labor card issue: "Given the short time frame between Dobson's complaints and the demotion decision, it is a fair inference to make that Gomoluch was demoted because of Dobson's complaints." (ECF No. 20, ¶ 49.) In October 2013, even though he was no longer his supervisor, Gomoluch prepared comments for Dobson's annual review because Gomoluch had been Dobson's supervisor for most of that period. The review was a poor one. Gomoluch opined that Dobson rarely met his expectations and needed improvements in most aspects of being a supervisor. (ECF No. 17 at ¶ 52.) The low rating rendered Dobson ineligible to receive a bonus that year.

On November 14, 2013, Dobson met with Nystrom and Wetak, the new plant manager, who informed him he would not be receiving a bonus that year. The same day, Dobson went to Nystrom's office and accused the company of retaliating against him for filing a complaint with the Department of Defense regarding the labor card issues. During the meeting, Dobson discussed how he was taking his grievance all the way to the CEO and exclaimed that "before this is over, I'm going to own [Gomoluch's] house!" (ECF No. 17, ¶ 55.) He slammed the door on the way out. (ECF No. 15-10 at 3.)

According to the company, Dobson's performance did not improve, and he was placed on a Performance Improvement Plan in January 2014. Problems with his performance still lingered, however, according to Kewaunee, with the new plant manager Wetak consistently noting problems with Dobson not being proactive and solving problems. During the ensuing months, Wetak alleges that Dobson became increasingly disengaged in his work and often tried shifting work to others or blaming others for his shortcomings. During early 2014 Dobson was also filing complaints with

4

Oshkosh Corporation, Kewaunee's parent, alleging he was being retaliated against. Wetak and Nystrom both state that Dobson's performance became unprofessional, and they viewed his response to the Performance Improvement Plan as insufficient. Dobson disagrees with their characterization, alleging that his performance was satisfactory the entire time. At a March 13, 2014 meeting, Wetak and Nystom allege that Dobson began yelling and pounding his fists. Dobson was suspended from work the next day and received a termination letter a week later. This lawsuit soon followed.

**II. Analysis**

Dobson alleges that Kewaunee retaliated against him by giving him a bad review and ultimately terminating his employment in response to his filing of the complaint with the Department of Defense in July 2014. The False Claims Act's anti-retaliation provision provides as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section . . .

31 U.S.C. § 3730(h)(1).

At the summary judgment stage, an employee must present evidence that (a) his actions were taken "in furtherance of" an FCA enforcement action and were therefore protected by the statute; (b) his employer had knowledge that he was engaged in this protected conduct; and (c) his discharge was motivated, at least in part, by the protected conduct. *Fanslow v. Chicago Mfg. Ctr.,*

5

*Inc.,* 384 F.3d 469, 479 (7th Cir. 2004).[3] Summary judgment is proper only if, taking the facts in the light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

**A. Protected Activity**

Kewaunee bases much of its summary judgment motion on its argument that Dobson never engaged in any activity protected by the False Claims Act. The relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Fanslow v. Chicago Mfg. Ctr., Inc.,* 384 F.3d 469, 480 (7th Cir. 2004) (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.,* 275 F.3d 838, 845 (9th Cir. 2002). As the Seventh Circuit made clear in *Neal v. Honeywell Inc.,* 33 F.3d 860, 864 (7th Cir.1994), the statute covers complaints that, although reasonable in prospect, do not pan out and thus do not lead to successful actions under the False Claims Act. The anti-retaliation provision "limits coverage to situations in which litigation could be filed legitimately—that is, consistently with Fed.R.Civ.P. 11. Then an employee who fabricates a tale of fraud to extract concessions from the employer, or who just imagines fraud but lacks proof, legitimately may be sacked. No action is 'to be filed' in either case, and employees who use reports of fraud to better their own position, or who behave like Chicken Little, impose costs on employers without advancing any of the goals of the False Claims Act." *Id.* at 864-85.

---

[3] *Gross v. FBL Financial Services Inc.,* 557 U.S. 167, 176 (2009), means that the causation analysis is now a "but for" test.

**1. Dobson and a Reasonable Employee Might Believe Fraud could be Occurring**

The question is whether Dobson is a "Chicken Little" or whether his assertions, while ultimately fruitless, were nevertheless legitimate. The *Lang* case lies at the Chicken Little end of the spectrum. There, an employee of Northwestern University Medical Foundation called the FBI "to proclaim that executives of the Northwestern Medical Faculty Foundation were lying to the Federal Reserve in order to obtain a 'gold bond rating' plus a federal loan on easy terms." *Lang v. Northwestern Univ.,* 472 F.3d 493 (7th Cir. 2006). After she was fired, the district court and Seventh Circuit made short shrift of the claim, noting that the Plaintiff had no independent access to the relevant information and that the Federal Reserve does not even make private loans like the one she was describing. In short, "Lang's beliefs were fantasies" and therefore her activity was not protected under the FCA. *Id.* at 495.

Kewaunee argues that Dobson's case should be dismissed because, like *Lang*, he had no access to key information, particularly the crucial fact that Kewaunee's internal labor records—the labor cards Dobson complained about—played no role in the amounts they charged to its clients. In other words, Kewaunee billed its clients (e.g., government contractors like Oshkosh Defense) on a fixed-price basis without respect to how much labor the project required. The price the customer would pay had *already* been determined by the time the labor cards were used. (ECF No. 17, ¶ 27.) Employees at the company could have marked down any number of hours on a labor card, but it would not impact the price the government ultimately paid because the government never saw those figures. Thus, any problems with the labor cards were purely an internal time-tracking or accounting issue rather than anything the company would use as the basis for a false claim. Dobson admits that when he filed the complaint, he didn't know how Kewaunee charged

7

its clients, and in fact his initial complaint form merely asks the Department of Defense to "have the Military Accountants look into this to see if this is legal. It might be ok, but it appears that it is wrong." (ECF No. 23-2 at 10.) To Kewaunee, this vague kind of "might be ok" and "appears . . . wrong" language is evidence that Dobson was merely speculating about whether his employer was committing fraud. Therefore, he did not have a subjective, good faith belief that fraud was occurring, and neither would a reasonable employee in similar circumstances.

Dobson argues that his case is more like *Fanslow v. Chicago Mfg. Ctr., Inc.,* 384 F.3d 469, 480 (7th Cir. 2004), where the Seventh Circuit reversed a grant of summary judgment when the employee complained to his superiors and to a government official about side ventures funded by government grants. The court noted that the employee did not know all the details about the programs or the funding agreements, or even whether the activity was illegal, but even so, "Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Id.* at 481. "It is unclear on this record . . . whether Fanslow sufficiently understood, or should have understood, the terms of the NIST agreements at the time of his investigation and whether a reasonable employee in these circumstances would have thought the same." *Id.*

Although a close question, a jury conceivably could find that Dobson would have believed that fraud was occurring or that it might occur based on Gomoluch's directive, which for present purposes we must assume to have been issued. In *Lang* the Plaintiff's complaint was based on pure fantasy and no *qui tam* complaint would ever satisfy Rule 11. Here, Dobson did not know what we know now, which is that time cards did not impact the price the government paid. It was not fantastical to believe that sloppiness with labor cards could impact the government's bottom line.

8

And if the plant manager is the one giving the recommendation, the employee could conceivably believe that such sloppiness could be occurring elsewhere in the company.

*Fanslow* and other cases make clear that the anti-retaliation provision protects the investigative process, and an employee need not have all his facts together when he files a complaint. It is true that Dobson's "investigation" was nonexistent: immediately following the tense meeting with Gomoluch, at which he clearly sensed that his job was on the line ("you can fire me right now"), Dobson never asked anyone whether the labor cards could be involved in fraud, but instead raced to the Department of Defense website to file a vague grievance asking "military accountants" to look into matters. Kewaunee might argue that the filing a whistleblower complaint immediately after a solitary comment from a supervisor, with no indication that any fraud was actually occurring, was precipitous and indicative of a lack of *bona fide* interest in reporting actual fraud. It might be true that Dobson was not trying "to put all the pieces of the puzzle together," *id*. at 481, but instead was trying to "use reports of fraud to better [his] own position," *Neal*, 33 F.3d at 864-65, to gain some kind of leverage for a job upon which he seemed to have only a tenuous hold. But those are fact questions and inferences best made by a jury, not conclusions reachable on summary judgment.

## B. Dobson's Termination

Similarly, fact questions permeate the questions surrounding Dobson's termination. If he was engaged in protected activity, as a jury could find, and the supervisor Dobson blew the whistle on was the very same individual who wrote Dobson's damning performance review, a jury could connect the dots and find that the stated reasons for his termination are pretextual. Of course, the same jury would learn that the labor cards had no connection with government fraud, and so it

9

could also conclude that there would have been no *reason* to retaliate since Dobson was "exposing" something essentially benign, something which the company itself investigated.

As for Dobson's performance, Dobson denies just about everything the company's witnesses have said, and there are no obvious smoking guns that would clearly have warranted his termination. Instead, the company has cited a number of incremental missteps and problems in his performance that *could* have warranted termination, if a jury believes the company. But because fact questions persist in almost all aspects of Dobson's job performance, as well as the question of when the company learned of the complaint, summary judgment would be inappropriate.

### III. Conclusion

For the reasons given above, the motion for summary judgment is **DENIED**.

**SO ORDERED** this 30th day of July, 2015.

/s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court